## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TERESA MATTHEWS, REGINALD MATTHEWS, DMITRIY BEKKER, MAKYA LITTLE, DELMAR LITTLE, JAMES GARTNER, and ERICA SMITH, c/o Mason Lietz & Klinger LLP 5101 Wisconsin Avenue NW, Suite 305 Washington, D.C. 20016, Individually and on Behalf of a Class of Persons Similarly Situated, | : : : : : : : : : : : | |
| Plaintiffs, | : : | **Civil Action No. 20-595 (DLF)** |
| v. | : : : | |
| THE DISTRICT OF COLUMBIA, c/o Karl A. Racine, Office of the Attorney General for the District of Columbia 441 4th Street NW, Suite 1110 South Washington, D.C. 20001 | : : : : : : | |
| Defendant. | : : | |

### FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs Teresa Matthews, Reginald Matthews, Dmitriy Bekker, Makya Little, Delmar Little, James Gartner, and Erica Smith ("Plaintiffs"), individually and on behalf of other similarly situated individuals, by and through their undersigned attorneys, file this Class Action Complaint against the District of Columbia ("Defendant"), and allege the following based on personal knowledge, the investigation of counsel, and information and belief.

### NATURE OF THE ACTION

1.      This lawsuit is a constitutional challenge to a municipality's persistent and widespread custom and practice of using its Automated Traffic Enforcement ("ATE") system for revenue generation. The action arises from the unlawful and unconstitutional use of the ATE

system as a purported means of enforcing District of Columbia traffic regulations and statutes, when in fact the purpose is to raise revenue. Defendant knowingly and intentionally used the ATE speed camera located on Interstate 295 in Washington, D.C. ("D.C. 295"), 0.4 miles south of Pennsylvania Avenue SE headed southwest-bound, to raise millions of dollars of revenue, by doubling the civil fines for a work zone that does not exist or that is improperly marked. Defendant also knowingly and intentionally recalibrated, and continues to have recalibrated, other speed cameras along D.C. 295 to reflect work zones that did not have (and do not have) multiple warning signs when work is not in progress. Plaintiffs assert claims for unjust enrichment, monies had and received, violations of 42 U.S.C. § 1983 (violations of the 8th and 14th Amendments of the United States Constitution), and for declaratory judgment and injunctive relief.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1441, as this case was removed to this Court after initially being filed in state court.

3.      This Court has subject matter jurisdiction over Plaintiffs' federal constitutional causes of action (Counts) under 28 U.S.C. § 1331 because each raises questions of federal law.

4.      This Court also has supplemental jurisdiction over Plaintiffs' state-law causes of action (Counts) under 28 U.S.C. § 1367.

5.      Venue in this Court is proper under 28 U.S.C. § 1391 because the incidents described in this complaint took place in the District of Columbia.

## IDENTIFICATION OF PARTIES

6.      Plaintiff Teresa Matthews is a citizen and resident of the State of Maryland, currently residing at 1108 Mornington Place, Capital Heights, MD 20743.

7.      Plaintiff Reginald Matthews is a citizen and resident of the District of Columbia,

currently residing at 1400 Congress Place SE, #102, Washington, D.C. 20020.

8.      Plaintiff Dmitriy Bekker is a citizen and resident of the State of Maryland, currently residing at 13601 Cedar Creek Lane, Silver Spring, MD 20904.

9.      Plaintiff Makya Little is a citizen and resident of the Commonwealth of Virginia, currently residing at 4829 Montega Drive, Woodbridge, VA 22195.

10.     Plaintiff Delmar Little is a citizen and resident of the Commonwealth of Virginia, currently residing at 4829 Montega Drive, Woodbridge, VA 22195.

11.     Plaintiff James Gartner is a citizen and resident of the Commonwealth of Virginia, currently residing at 2223 N. Harrison Street, Arlington, VA 22205.

12.     Plaintiff Erica Smith is a citizen and resident of the Commonwealth of Virginia, currently residing at 3200 Martha Custis Drive, Alexandria, VA 22302.

13.     Defendant The District of Columbia is a sovereign municipality.

## FACTUAL BACKGROUND

14.     In 1996, the D.C. City Council authorized the use of an automated traffic enforcement ("ATE") system. These statutes were codified by D.C. Code §§ 50-2209.01–50-2209.04 & 50-2209.11 (2001) and implemented through regulations by D.C. Mun. Regs. tit. 18, § 1035 (2001 & 2010). D.C. Code § 50–2209.01 (2001) provides:

(a)     The Mayor is authorized to use an automated traffic enforcement system to detect moving infractions. Violations detected by an automated traffic enforcement system shall constitute moving violations. Proof of an infraction may be evidenced by information obtained through the use of an automated traffic enforcement system. For the purposes of this subchapter, the term "automated traffic enforcement system" means equipment that takes a film or digital camera-based photograph which is linked with a violation detection system that synchronizes the taking of a photograph with the occurrence of a traffic infraction.

(b)     Recorded images taken by an automated traffic enforcement system are prima facie evidence of an infraction and may be submitted without authentication.

15.     "When a violation is detected by an automated traffic enforcement system, the Mayor shall mail a summons and a notice of infraction to the name and address of the registered owner of the vehicle on file with the [DMV]" D.C. Code § 50–2209.02(b).

16.     In the District of Columbia Traffic Act of 1925, which is the statute governing the employment of ATE systems, a "work zone" is defined as:

> "the area of a highway or roadway that is affected by construction, maintenance, or utility work activities, including the area delineated by and within all traffic control devices erected or installed to guide vehicular, pedestrian, and bicycle traffic."

D.C. Code § 50-2201.02(20).

17.     The D.C. Code goes on to permit doubling of civil fines for infractions committed within a work zone, but requires D.C. to implement mandatory signage:

> (a)     For any motor vehicle moving infraction, as defined in Chapter 26 of Title 18 of the District of Columbia Municipal Regulations, committed by the driver within a work zone, the civil fine shall be double the amount otherwise prescribed and, in a criminal infraction case, the fine shall be one category higher than the penalty prescribed by law.
>
> (b)     Signs or notices shall be affixed at the point of ingress of constriction or work zones alerting drivers of doubled fines and increased penalties for moving infractions within the zone.

D.C. Code § 50-2201.04c.

18.     The plain language of the applicable sections of the D.C. Code (D.C. Code §§ 50-2201.02 & 50-2201.04c) limits D.C.'s doubling of the civil fines to infractions recorded by ATE in an "area of a highway or roadway that is affected by construction, maintenance, or utility work activities," and where there are "signs or notices . . . affixed at the point of ingress of construction or work zones alerting drivers of doubled fines and increased penalties for moving infractions within the zone."

**THE ANACOSTIA BRIDGES AT NICHOLSON LANE SE PROJECT**

19.     On February 20, 2018, Defendant (through the D.C. Department of Transportation, or DDOT) commenced a six-phase project focusing on the rehabilitation of the I-295 bridge deck over Nicholson Street SE and adjoining ramps to address deteriorating structural elements.

20.     This construction project, entitled "Anacostia Bridges at Nicholson Lane SE", involved: A) construction of a 32' bridge median crossover on I-295 to create additional lanes for traffic shifts throughout the project phases; B) demolition and reconstruction of the southbound Mainline bridge (I-295) section; C) demolition and reconstruction of the northbound Mainline bridge (I-295) section; D) installation of median barriers (Mainline bridge/I-295) and restoration of traffic lanes to their final configuration; E) demolition and replacement of the on-ramp to I-295 southbound; and F) demolition and replacement of the off-ramp from I-295 northbound.

21.     A portion of the construction project involved work on the southbound lanes of I-295 between Pennsylvania Avenue SE and the I-695 bridge.

22.     In that stretch of roadway, 0.4 miles south of Pennsylvania Avenue SE heading southwest bound, Defendant D.C. has installed an ATE camera, designated as Camera ID 73 ("Camera 73").

23.     Upon its installation, and up until the beginning of the construction project, Camera 73 was calibrated to enforce the established speed limit of fifty (50) miles per hour (mph) on the southbound stretch of Interstate 295 between Pennsylvania Avenue SE and the current location of the I-695 bridge (at 11th Street SE).

24.     On or about May 24, 2019, Camera 73 was re-calibrated to enforce a lowered speed limit of forty (40) mph on that stretch of Interstate 295 southbound, because Defendant D.C. contends that on or about that date, the area monitored by Camera 73 came to be within the

boundaries of a designated work zone.

25.     No engineering studies or traffic investigation was conducted prior to lowering the speed limit to forty (40) mph.

26.     On or about that same date, Defendant D.C. erected a single permanent signpost advising of the alleged work zone, the 40-mph speed limit, and the doubling of traffic fines.

27.     The contention that Camera 73 was within the boundaries of a designated work zone on or about May 24, 2019 is belied by DDOT's own "traffic advisories" issued in connection with the construction project.

28.     The traffic advisories issued for the periods beginning on April 8, 2019 until July 1, 2019 show that from approximately April 8, 2019 until approximately July 1, 2019, all work being performed on the construction project was occurring on the Pennsylvania Avenue SE ramp that was closed on weekends, in the area depicted here:



29.     This work zone does not include the area where Camera 73 is located.

30.     According to DDOT's traffic advisories, no work was performed on the construction projection from July 1, 2019 until August 13, 2019.

31.     Work on the overall construction project resumed on August 13, 14, 19, and 20,

2019, but none of the work involving the stretch of Interstate 295 regulated by Camera 73. Indeed, the work performed on those dates detoured traffic away from that stretch of roadway entirely, as shown here[1]:



32.     According to DDOT's own traffic advisories, the first time after the recalibration of Camera 73 to reflect the 40-mph speed limit that any of the southbound lanes of I-295 were worked upon in the area monitored by Camera 73 was on August 23-24, 2019, when the left lane was closed.[2]

33.     Based upon DDOT's own records, Camera 73 was therefore monitoring a "designated work zone" that did not exist from May 24, 2019 to August 23, 2019.

---

[1] http://nicholsonse.anacostiabridges.com/temporary-ramp-and-lane-closures-on-dc-295-august-19-august-24/

[2] The traffic advisories show other work on the southbound lanes of I-295 in the area monitored by Camera 73 from the start date of the project until May 24, 2019, but according to sworn declarations from DDOT, Camera 73 was not recalibrated to 40 mph until that date.

34.     Even after work actually commenced on August 23, 2019 on the southbound stretch of Interstate 295 monitored by Camera 73, the work only occurred sporadically, and mostly on weekends and at night.

35.     According to the DDOT traffic advisories, work on the southbound lanes of Interstate 295 in the area monitored by Camera 73 occurred on the following dates and times only:

  a.      Friday, August 23, 2019 at 8 p.m. to Saturday, August 24, 2019 at 8 p.m.;

  b.      Tuesday, August 27, 2019 from 8 p.m. to 5 a.m.;

  c.      Wednesday, September 11, 2019 through Friday, September 14, 2019 from 8 p.m. to 5 a.m.;

  d.      Sunday, September 15, 2019 through Friday, September 20, 2019 from 8 p.m. to 5 a.m. (with northbound and southbound alternating lane closures);

  e.      Sunday, September 22, 2019 through Friday, September 27, 2019 from 8 p.m. to 5 a.m. (with northbound and southbound alternating lane closures);

  f.      Sunday, September 29, 2019 through Friday, October 4, 2019 from 8 p.m. to 5 a.m. (with northbound and southbound alternating lane closures);

  g.      Sunday, October 6, 2019 through Friday, October 11, 2019 between 8 p.m. and 5 a.m.(with northbound and southbound alternating lane closures);

  h.      Saturday, October 12, 2019 from 8 a.m. to 8 p.m.;

  i.      Sunday, October 13, 2019 through Saturday, October 19, 2019 from 8 p.m. to 5 a.m.;

  j.      Saturday, October 19, 2019 to Monday, October 21, 2019 from 8 p.m. to 5 a.m.;

  k.      Sunday, October 20, 2019 through Saturday, October 26, 2019 from 8 p.m. to

5 a.m.;

l.      Monday, November 25, 2019 and Tuesday, November 26, 2019 from 10 a.m.

to 3 p.m.; and

m.      Wednesday, November 27, 2019 from 10 a.m. to 12 p.m.

36.     On each of the occasions when work was being performed on the southbound lanes

in the area monitored by Camera 73, DDOT's traffic advisories indicate that the single signpost

denoting a work zone was supplemented with additional traffic control devices as follows:

"Traffic controls will be in place to warn drivers approaching the areas and guide them

through the construction zone."

37.     These additional traffic control devices included, at different times, additional

signs, cones, lights, barrels, flags, and flagging personnel.

38.     Between March 24, 2019 and December 9, 2019, at all times other than those during

which work was being actively performed on the southbound lanes of Interstate 295 in the area

monitored by Camera 73 (and during which additional traffic control devices were employed by

DDOT), the only traffic control device advising of a work zone was the single permanent signpost.

39.     Between March 24, 2019 and December 9, 2019, Camera 73 was calibrated to and

did continuously record speeds in excess of forty (40) mph, issuing speeding citations for speeds

in excess of forty (40) mph, regardless of whether any work was being performed on Interstate

295 southbound in or around the area in which the camera was located, and without the presence

of any sign other than the single signpost.

40.     On December 9, 2019, according to a sworn declaration by DDOT personnel,

Camera 73 was recalibrated back to fifty (50) mph.

## D.C. HAS A FINANCIAL INCENTIVE TO DESIGNATE A MAJOR HIGHWAY AS A WORK ZONE AND TO DOUBLE THE FINES

41.     It is the persistent and widespread custom and practice of Defendant D.C. to configure its ATE system to maximize revenue as demonstrated by its use of multiple-recalibrated speed cameras that issue citations for double fines in non-existent or improperly marked work zones.

42.     It is well-documented that Defendant D.C. is heavily dependent upon the revenue derived from its ATE system.

43.     D.C.'s revenue from its ATE system has soared over the past several years, rising to about $194.1 million in fiscal 2017, a small but significant increase from the $190 million brought in in fiscal 2016 and a huge leap from about $117 million in fiscal 2015.[3]

44.     According to AAA Mid-Atlantic, D.C. red light camera tickets are 200 percent higher than they are in Virginia and 100 percent higher than they are in Maryland. Speed camera tickets range from $50 to $300 in D.C., while such tickets are $40 in Maryland and do not exist in Virginia. The District's highest speed camera ticket of $300 is 650 percent higher than a speed camera ticket in a work zone or school zone in Maryland.[4]

45.     Revenue collected through parking and photo citation enforcement currently goes to D.C.'s General Fund, which funds government operations, debt financing, and helps pay for water and sewer services.[5]

46.     Sayin Taylor, who used to work in the D.C. Office of the Chief Financial Officer,

---

[3] https://www.bizjournals.com/washington/news/2017/12/04/district-sees-soaring-revenue-from-speed-cameras-a.html
[4] https://www.washingtoncitypaper.com/news/article/21022176/dc-traffic-tickets-the-district-profits-and-residents-pay
[5] *Id.*

stated:

> In 2017, the total revenue was $190 million supporting the General Fund. If the District adopted a fee structure that is less onerous on low income families—let's say cutting the fines by half—then the city would have to find a way to make up $80 million of revenue. In other words, we [D.C.] are addicted to the revenue and it is so large now that it is hard to make up for it.[6]

47.    "The city unfortunately uses various fines as a revenue source," says David Brunori, professor of public policy and public administration at George Washington University. "There is a place for fines—to deter bad behavior. But there is something untoward to use them for General Fund revenue. The problem is that the city raises so much money fining people that it becomes a part of the budget. The city almost needs people to speed because they are relying on the money."[7]

48.    In 2019-20, the traffic enforcement in Washington, D.C., crossed the line into predatory behavior, according to a report from AAA, with D.C. raking in more than $1 billion from traffic violations in 2019.[8]

49.    D.C. has the 20th largest population in the United States but managed to surpass all other cities in traffic citation revenue.[9]

50.    D.C. fines from traffic citations surpassed the combined revenue raised from D.C. taxes on alcohol, cigarettes, fuel, vehicles, licenses, permits, property, and estate taxes.[10]

51.    In February 2020, an AAA spokesperson stated AAA would likely change D.C.'s ranking from "strict enforcement zone" to a "traffic trap," and further noted AAA would be

---

[6] *Id.*

[7] *Id.*

[8] https://www.washingtonexaminer.com/news/dc-deemed-predatory-after-raking-in-more-than-1b-in-traffic-fines

[9] *Id.*

[10] *Id.*

revoking its support for the city's automated enforcement program, which is a system of traffic cameras that can issue citations.[11]

52.     Typically, the revenue from traffic cameras tapers off as more residents become aware of the location of the devices and start driving safely in the area. However, in D.C., revenue has remained steady, leaving the AAA spokesperson to state that the cameras are just being used to surprise drivers and rake in revenue, rather than changing drivers' behavior.[12]

53.     The AAA spokesperson said, "No one really believes this is about traffic safety any longer, which is the reason we're withdrawing support for the automated enforcement program in the District."[13]

54.     In October 2019, D.C. Mayor Muriel Bowser moved control of the city's ATE program from D.C. police to DDOT, over the objection of the D.C. City Council.[14]

55.     This move brought D.C.'s team of twenty (20) city employees overseeing the ATE program under the Mayor and DDOT's control. DDOT is currently headed by Director Jeff Marootian.

56.     D.C. administration officials have publicly stated that bringing the ATE system under DDOT's control will expedite the employment of additional traffic cameras, and gives DDOT, Director Marootian, and the team of twenty (20) city employees overseeing the ATE system the discretion about where to place additional traffic cameras, taking the authority to determine the placement of cameras away from law enforcement.[15]

---

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] https://www.washingtonpost.com/transportation/2019/10/01/bowser-does-an-end-run-around-dc-council-transfers-speed-red-light-camera-program-ddot/
[15] *Id.*

57.     As part of the October 2019 transition of control over the ATE system from the D.C. Police to DDOT, Deputy Mayor Lucinda Babers stated that DDOT was already contemplating adding additional cameras to the ATE system, and was further contemplating reducing the threshold speed allowed before a citation is issued.[16]

58.     According to a AAA spokesman, all of these actions are "only about revenue," and are "not about traffic safety."[17]

59.     The institutional revenue incentive drives Defendant D.C. to configure its ATE system to maximize revenue in a widespread and persistent manner, and is so pervasive as to constitute a custom and practice.

60.     This custom and practice is carried out by Director Marootian and the team of twenty (20) D.C. employees overseeing the ATE program, in the course and scope of their official job duties as D.C. employees.

61.     This widespread and persistent practice deprives Plaintiffs and Class Members of due process of law, is arbitrary, egregious and shocks the conscience.

## CAMERA 73 WAS RECALIBRATED AS A REVENUE GENERATING SPEED TRAP,  AND NOT TO ENHANCE PUBLIC SAFETY

62.     As part of the construction project, there were several occasions prior to May 24, 2019 (the date on which D.C. recalibrated Camera 73) where DDOT performed work on the southbound lanes of Interstate 295 in the area monitored by Camera 73. According to DDOT's traffic advisories, work was performed on or affected (through traffic shifts) those southbound lanes on the following dates when Camera 73 was not recalibrated to forty (40) mph:

        a.     July 6-7, 2018;

---

[16] *Id.*
[17] *Id.*

b.    Sunday, November 4, 2018 until Saturday, November 10, 2018 from 8 p.m. to 5 a.m.;

c.    Saturday, December 8, 2018;

d.    Monday, December 10, 2018 to Saturday, December 15, 2018 during off-peak hours from 10 a.m. to 3 p.m. and 8 p.m. to 5 a.m. each day;

e.    Saturday, December 15, 2018 at 7:00 am until Monday, December 17, 2018 at 5:00 am;

f.    Monday, December 17, 2018 to Friday, December 21, 2018 during off peak hours from 10 a.m. to 3 p.m. and 8 p.m. to 5 a.m. each day;

g.    Saturday, December 22, 2018 until Saturday, December 29, 2018 during off peak hours;

h.    From Saturday morning, January 12, 2019 until Monday, January 14, 2019 at 5 a.m.;

i.    Saturday, January 26, 2019 until Monday, January 28, 2019 at 5 a.m.;

j.    Monday January 28, 2019 through Saturday, February 2, 2019 from 10:00 am to 3:00 pm and from 8:00 pm to 5:30 am (intermittent during off-peak hours);

k.    Saturday, February 9, 2019 at 6 a.m. until Monday, February 11, 2019 at 5 a.m.;

l.    Monday, February 11, 2019 until segment completion, during off-peak hours, from 10 a.m. to 3 p.m. and 8 p.m. to 5 a.m.;

m.    Saturday, February 16, 2019 at 6 a.m. until Monday, February 18, 2019 at 5 a.m.;

n.    Monday, February 18, 2019 through Friday, February 22, 2019, during off-

peak hours, from 10 a.m. to 3 p.m. and 8 p.m. to 5 a.m.;

o.    Saturday, February 23, 2019 at 6 a.m. until Monday, February 25, 2019 at 5 a.m.; and

p.    Monday, February 25, 2019 through Friday, March 1, 2019, during off-peak hours, from 10 a.m. to 3 p.m. and 8 p.m. to 5 a.m.

63.    The absence of any recalibration of Camera 73 during these times of construction on the area the camera monitored demonstrates that there was no public safety reason to recalibrate Camera 73 to forty (40) mph.

64.    Instead of recalibrating Camera 73 to enforce a reduced speed when work was actually being performed on the area being monitored, D.C. arbitrarily recalibrated Camera 73 to enforce a 40-mph speed limit for a three (3) month period when no work was being performed on that stretch of southbound Interstate 295 (as shown above).

65.    Camera 73 enforced a 40-mph speed limit 24/7 from May 24, 2019 until December 9, 2019, including at all of the times when no work was being performed (*i.e.*, at all the times intervening the times that actual work was being performed on Interstate 295 southbound in the area of the camera listed above).

66.    The recalibration of Camera 73 to the lower 40-mph speed limit had no effect on the safety of non-existent work crews or highway drivers passing a non-active work zone, but had an immediate and dramatic effect on the number of traffic citations issued by the camera. On D.C. 295, cameras caught 22,889 speeding drivers in June 2019, compared to 9,438 in May 2019.[18]

67.    Camera 73 was recalibrated to forty (40) mph without performing any engineering studies or traffic investigation.

---

[18] https://wtop.com/dc-transit/2019/08/drivers-behaving-badly-where-d-c-issues-the-most-tickets/

68.    Camera 73 is one of D.C.'s most productive and controversial ATE devices, generating more than $26 million in revenue over a two-and-a-half-year period.[19]

69.    While Camera 73 was finally recalibrated back to fifty (50) mph on December 9, 2019, it was not for public safety reasons, as evidenced by the fact that work was still being performed on the stretch of roadway monitored by that camera after that date. According to DDOT's own traffic advisories, work was performed from Thursday, December 12, 2019 through Saturday, December 14, 2019, and again from Sunday, December 15, 2019 through Wednesday, December 18, 2019.

70.    Defendant D.C. recalibrated Camera 73 on December 9, 2019, only after the television station WJLA ABC-7 ran two initial stories about the camera (on November 18, 2019 and November 19, 2019) and a third story on December 9, 2019 (the same day the camera was recalibrated) entitled "DC councilmember moves for answers after 7 On Your Side speed camera investigation."[20]

71.    In the December 9, 2019 WJLA story, D.C. Ward 3 councilmember Mary Cheh—who also oversees the D.C. City Council Committee on Transportation and the Environment, was quoted as saying, "I can't help but think that this is, at least in part, about revenue generation."[21]

**OTHER DC INTERSTATE 295 CAMERAS WERE AND CONTINUE TO BE RECALIBRATED FOR IMPROPERLY SIGNED WORK ZONES**

72.    Other speed cameras along D.C. 295 were, and continue to be, recalibrated for work zones as part of the larger construction project (entitled "Improving D.C. 295") of which the Anacostia Bridges construction project is a part.

---

[19] https://wjla.com/features/7-on-your-side/notorious-295-speed-camera
[20] https://wjla.com/features/7-on-your-side/dc-city-councilmember-moves-for-answers-after-7-on-your-side-speed-camera-investigation
[21] *Id.*

73.     According to DDOT's traffic advisories, all of the speed cameras on both the northbound and southbound lanes monitoring the section of I-295 between the area south of Exit 1: US Naval Research Laboratory and the area south of East Capitol Street were recalibrated to forty (40) mph on May 24, 2019.

74.     When work is actually being performed around those other speed cameras that were, and are currently, recalibrated to forty (40) mph, these other work zones have temporary traffic control signs, cones, barrels, flashing lights, and other forms of traffic control devices and personnel, alerting motorists to the presence of both the work zones, the lowered speed limits, and the recalibrated speed cameras (with doubled fines).

75.     However, when work is not being performed in these other work zones, the temporary traffic control devices are removed, leaving the work zones, lowered speed limits, and the recalibrated speed cameras (with doubled fines) without signage that complies with D.C. Code §§ 50-2201.02 & 50-2201.04c.

76.     For example, at 12:40 p.m. on March 29, 2020, Plaintiffs Makya and Delmar Little received traffic citation F114095294 from the traffic camera located on D.C. 295, 0.4 miles south of Exit 2 heading southbound, and were issued a $200 ticket for traveling fifty-two (52) mph through a 40-mph work zone. *See* **Exhibit A**.

77.     According the D.C.'s own traffic advisories, work had ceased at that location at 4:45 a.m. on March 29, 2020.

78.     As the photographs on Plaintiffs Makya and Delmar Little's citation show, no temporary traffic control devices or signs alerting drivers to the recalibrated speed camera were in place at the time of their citation. *See* **Exhibit A**.

79.     Plaintiffs Little did not see any signs denoting that the area in which they received

their ticket was a work zone, that the speed limit was only forty (40) mph, or that the fines were doubled.

80.    The doubled civil fine was unlawful and unconstitutional, in that: A) no ticket would have been issued for traveling fifty-two (52) mph in a fifty (50)-mph area (as D.C. has a well-publicized practice of not issuing tickets for speeds less than ten (10) mph over the posted speed limit); and B) the alleged work zone was not established in accordance with the mandatory requirements of the D.C. Code, in that it lacked multiple signs or notices.

81.    Similarly, at 2:54 p.m. on March 29, 2020, Plaintiff James Gartner received traffic citation F114106715 from the traffic camera located on D.C. 295, 0.4 miles south of Exit 2 heading southbound, and was issued a $200 ticket for traveling fifty-three (53) mph through a 40-mph work zone. *See* **Exhibit B**.

82.    According the D.C.'s own traffic advisories, work had ceased at that location at 4:45 a.m. on March 29, 2020.

83.    As the photographs on Plaintiff Gartner's citation show, no temporary traffic control devices or signs alerting drivers to the recalibrated speed camera were in place at the time of his citation. *See* **Exhibit B**.

84.    Plaintiff Gartner did not see any signs denoting that the area in which he received his ticket was a work zone, that the speed limit was only forty (40) mph, or that the fines were doubled.

85.    The doubled civil fine was unlawful and unconstitutional, in that: A) no ticket would have been issued for traveling fifty-three (53) mph in a fifty (50)-mph area (as D.C. has a well-publicized practice of not issuing tickets for speeds less than (ten) 10 mph over the posted speed limit); and B) the alleged work zone was not established in accordance with the mandatory

requirements of the D.C. Code, in that it lacked multiple signs or notices.

86.     In addition, on at 2:54 p.m. on November 23, 2019, Plaintiff Erica Smith received traffic citation F109647320 from the traffic camera located on D.C. 295, 0.2 miles south of Exit 1 heading northbound, and was issued a $200 ticket for traveling fifty-two (52) mph in a 40-mph work zone. *See* **Exhibit C**.

87.     According to DDOT's traffic advisories, no work was being performed in that area on November 23, 2019, with reported work ending on November 10, 2019.

88.     Plaintiff Smith did not see any signs denoting that the area in which she received her ticket was a work zone, that the speed limit was only forty (40) mph, or that the fines were doubled.

89.     The doubled civil fine was unlawful and unconstitutional, in that: A) no ticket would have been issued for traveling fifty-two (52) mph in a fifty (50)-mph area (as D.C. has a well-publicized practice of not issuing tickets for speeds less than ten (10) mph over the posted speed limit); and B) the alleged work zone was not established in accordance with the mandatory requirements of the D.C. Code, in that it lacked multiple signs or notices.

90.     As of today's date, May 4, 2020, there are still speed cameras (including without limitation the camera at D.C. 295, 0.4 miles south of Exit 2 heading southbound) that are recalibrated to forty (40) mph, and that are left without multiple signs to alert motorists when work is not being performed in the areas monitored by those cameras.

91.     D.C. has a systemic custom and practice of configuring its ATE system to maximize revenue, as demonstrated by its use of multiple-recalibrated speed cameras that issue citations for double fines in non-existent or improperly marked work zones.

## FACTS PERTINENT TO TERESA MATTHEWS

92.     On November 8, 2019 at 11:56 a.m., Plaintiff Teresa Matthews was traveling on D.C. 295, 0.4 miles south of Pennsylvania Avenue SE headed southwest bound in her Cadillac Crossover SUV bearing the MD license plate of 9BZ0077.

93.     At or near that location on D.C. 295, the posted speed limit is fifty (50) miles per hour (mph).

94.     At or around the same time, Plaintiff Teresa Matthews was traveling fifty-two (52) mph in her Cadillac Crossover SUV.

95.     At or near the same location on D.C. 295, Defendant installed a speed camera as part of its ATE system.

96.     At or near that same location on D.C. 295, Defendant installed a single, small sign denoting a work zone that construed the speed limit in that area as dropping from fifty (50) mph to forty (40) mph, and calibrated the ATE speed camera to register infractions for speeds in excess of forty (40) mph. Below is an actual picture of the forty (40)- mph work zone sign on D.C. 295.



97.     At the time Plaintiff Teresa Matthews was traveling through the purported work zone, there was only this single sign, not multiple signs or notices.

98.     Another picture of the forty (40) mph sign shows it is very difficult to see from the middle and far left lanes. Therefore, drivers are not alerted to the sudden drop in speed limit and doubling of fines for speeding.



99.     At the time Plaintiff Teresa Matthews was traveling through the purported work zone, the area of the highway or roadway was not affected by any construction, maintenance, and/or utility work activity.

100.    Defendant's own traffic advisories show that no work was being performed in that area on the date and time that Plaintiff Teresa Matthews was traveling through the purported work zone.

101.    Plaintiff has never observed any construction, maintenance, and/or utility work in that area at any time, despite traversing that area on an almost daily basis for the past five (5) years.

102.    At the location and time identified in the preceding paragraphs, Defendant's speed

camera registered a speeding infraction against Plaintiff Teresa Matthews for traveling fifty-two (52) mph in a 40-mph work zone. A copy of the resulting citation issued on November 19, 2019 is attached to this Complaint as **Exhibit D.**

103.    Because the Defendant had construed this area to be a valid work zone (despite the absence of any construction, maintenance, and/or utility work and despite the single non-conforming sign), the civil fine assessed against Plaintiff Teresa Matthews was doubled from $100 to $200.

104.    The citation also threatened to double the fine again to $400 if Plaintiff Teresa Matthews did not pay within thirty (30) days of the issuance of the citation (*i.e.*, by December 19, 2019).

105.    The citation further informed Plaintiff Teresa Matthews that failure to pay the doubled civil fine would be deemed an admission of liability that "will result in additional penalties" and the loss of right to a hearing.

106.    The citation went on to state that the failure to pay the doubled civil fine would cause a hold to be placed on the renewal of vehicle registration for vehicles registered in the District of Columbia and that this hold would continue "as long as the ticket is unpaid."

107.    The citation also informed Plaintiff Teresa Matthews that her vehicle might be immobilized or impounded if she had two or more unpaid tickets.

108.    The citation contained misrepresentations that the area in which the ticket was issued was a work zone, and that the fines were thus lawfully doubled.

109.    Faced with all these dire consequences, Plaintiff Teresa Matthews voluntarily paid the doubled civil fine of $200 on December 19, 2019. A copy of the electronic confirmation of

payment is attached to this Complaint as **Exhibit E.**

110.    Plaintiff Teresa Matthews was induced to make her voluntary payment based upon Defendant D.C.'s misrepresentation that the doubled fine was lawful.

111.    The doubled civil fine was unlawful and unconstitutional, in that: A) no ticket would have been issued for traveling fifty-two (52) mph in a fifty (50)-mph area (as D.C. has a well-publicized practice of not issuing a violation for speeds that are less than ten (10) mph over the posted speed limit); B) this area on D.C. 295 did not constitute a work zone as defined in the D.C. Code; and C) the alleged work zone was not established in accordance with the mandatory requirements of the D.C. Code, in that it lacked multiple signs or notices.

112.    As a consequence of paying the unlawful and unconstitutional doubled civil fine of $200, both Plaintiffs Teresa and Reginald Matthews (who are husband and wife) sustained monetary damages in the amount of $200.

## FACTS PERTINENT TO REGINALD MATTHEWS

113.    On November 8, 2019 at 10:43 a.m., Plaintiff Reginald Matthews was traveling on D.C. 295, 0.4 miles south of Pennsylvania Avenue SE headed southwest bound in his Audi bearing the D.C. license plate of BIGMITN.

114.    At or near that location on D.C. 295, the posted speed limit is fifty (50) miles per hour (mph).

115.    At or around the same time, Plaintiff Reginald Matthews was traveling fifty-five (55) mph in his Audi.

116.    At or near the same location on D.C. 295, Defendant installed a speed camera as part of its ATE system.

117.    At or near that same location on D.C. 295, Defendant installed a single, small sign

denoting a work zone that construed the speed limit in that area as dropping from fifty (50) mph

to forty (40) mph, and calibrated the ATE speed camera to register infractions for speeds in excess

of forty (40) mph.

118.   At the time Plaintiff Reginald Matthews was traveling through the purported work

zone, there was only a single sign, not multiple signs or notices.

119.   At the time Plaintiff Reginald Matthews was traveling through the purported work

zone, the area of the highway or roadway was not affected by any construction, maintenance,

and/or utility work activity.

120.   Defendant's own traffic advisories show that no work was being performed in that

area on the date and time that Plaintiff Reginald Matthews was traveling through the purported

work zone.

121.   Plaintiff has never observed any construction, maintenance, and/or utility work in

that area at any time, despite traversing that area on an almost daily basis for the past five (5) years.

122.   At the location and time identified in the preceding paragraphs, Defendant's speed

camera registered a speeding infraction against Plaintiff Reginald Matthews for traveling fifty-

five (55) mph in a forty (40) mph work zone. A copy of the resulting citation issued on November

14, 2019 is attached to this Complaint as **Exhibit F.**

123.   Because the Defendant had construed this area to be a valid work zone (despite the

absence of any construction, maintenance, and/or utility work activity and despite the single non-

conforming sign), the civil fine assessed against Plaintiff Reginald Matthews was doubled from

$100 to $200.

124.   The citation also threatened to double the fine again to $400 if Plaintiff Reginald

Matthews did not pay within thirty (30) days of the issuance of the citation (*i.e.*, by December 14,

2019).

125.    The citation further informed Plaintiff Reginald Matthews that failure to pay the doubled civil fine would be deemed an admission of liability that "will result in additional penalties" and the loss of right to a hearing.

126.    The citation went on to state that the failure to pay the doubled civil fine would cause a hold to be placed on the renewal of vehicle registration for vehicles registered in the District of Columbia and that this hold would continue "as long as the ticket is unpaid."

127.    The citation also informed Plaintiff Reginald Matthews that his vehicle might be immobilized or impounded if he had two or more unpaid tickets.

128.    The citation contained misrepresentations that the area in which the ticket was issued was a work zone, and that the fines were thus lawfully doubled.

129.    The doubled civil fine was unlawful and unconstitutional, in that: A) no ticket would have been issued for traveling fifty-five (55) mph in a fifty (50)-mph area (as D.C. has a well-publicized practice of not issuing tickets for speeds less than ten (10) mph over the posted speed limit); B) this area on D.C. 295 did not constitute a work zone as defined in the D.C. Code; and C) the alleged work zone was not established in accordance with the mandatory requirements of the D.C. Code, in that it lacked multiple signs or notices.

130.    As a direct and proximate consequence of the unlawful and unconstitutional ATE notice of violation, Plaintiff Reginald Matthews was damaged, in that he was forced to expend substantial time and endure substantial inconvenience fighting this citation (which was ultimately dismissed by a D.C. hearing officer).

## FACTS PERTINENT TO DMITRIY BEKKER

131.    On August 4, 2019 at 4:27 p.m., Plaintiff Dmitriy Bekker was traveling on D.C.

295, 0.4 miles south of Pennsylvania Avenue SE headed southwest bound in his Nissan Maxima bearing the MD license plate of 64KBYTE.

132.     At or near that location on D.C. 295, the posted speed limit is fifty (50) miles per hour (mph).

133.     At or around the same time, Plaintiff Bekker was traveling fifty-five (55) mph in his Nissan. At or near the same location on D.C. 295, Defendant installed a speed camera as part of its ATE system.

134.     At or near that same location on D.C. 295, Defendant installed a single, small sign denoting a work zone that construed the speed limit in that area as dropping from fifty (50) mph to forty (40) mph, and calibrated the ATE speed camera to register infractions for speeds in excess of forty (40) mph.

135.     At the time Plaintiff Bekker was traveling through the purported work zone, there was only a single sign, not multiple signs or notices.

136.     At the time Plaintiff Bekker was traveling through the purported work zone, the area of the highway or roadway was not affected by any construction, maintenance, and/or utility work activity.

137.     Although D.C. had recalibrated the speed camera at that location on May 24, 2019, DDOT's own traffic advisories show that no work was performed on the area of highway or roadway upon which Plaintiff Bekker was traveling from May 24, 2019 to August 23, 2019.

138.     At the location and time identified in the preceding paragraphs, Defendant's speed camera registered a speeding infraction against Plaintiff Bekker for traveling fifty-five (55) mph in a 40-mph work zone. A copy of the resulting citation issued on August 15, 2019 is attached to this Complaint as **Exhibit G**.

139.     Because the Defendant had construed this area to be a valid work zone (despite the absence of any construction, maintenance, and/or utility work activity and despite the single non-conforming sign), the civil fine assessed against Plaintiff Bekker was doubled from $100 to $200.

140.     The citation contained misrepresentations that the area in which the ticket was issued was a work zone, and that the fines were thus lawfully doubled.

141.     The citation also threatened to double the fine again to $400 if Plaintiff Bekker did not pay within thirty (30) days of the issuance of the citation (*i.e.*, by September 14, 2019).

142.     The citation further informed Plaintiff Bekker that failure to pay the doubled civil fine would be deemed an admission of liability that "will result in additional penalties" and the loss of right to a hearing.

143.     The citation also informed Plaintiff Bekker that his vehicle might be immobilized or impounded if he had two or more unpaid tickets.

144.     The doubled civil fine was unlawful and unconstitutional, in that: A) no ticket would have been issued for traveling fifty-five (55) mph in a fifty (50)-mph area (as D.C. has a well-publicized practice of not issuing tickets for speeds less than ten (10) mph over the posted speed limit); B) this area on D.C. 295 did not constitute a work zone as defined in the D.C. Code; and C) the alleged work zone was not established in accordance with the mandatory requirements of the D.C. Code, in that it lacked multiple signs or notices.

145.     On August 21, 2019, Plaintiff Bekker contested the citation, Request Number 1725266, pointing out that there were no temporary work zone speed limit signs, no construction cones, and no construction equipment in the area at the time he was ticketed. *See* **Exhibit H**.

146.     On March 20, 2020, D.C. denied Plaintiff Bekker's challenge to the ticket. *See* **Exhibit I**.

147.    On March 28, 2020, Plaintiff Bekker filed for reconsideration. *See* **Exhibit J**.

148.    On April 2, 2020, D.C. denied the request for reconsideration, and found Plaintiff Bekker liable for the ticket. *See* **Exhibit K**.

149.    On April 16, 2020, Plaintiff Bekker filed for an appeal. At that time, Plaintiff Bekker was forced to pay the $200 ticket, plus a $10 filing fee. *See* **Exhibit L**. There has been no ruling on his appeal to date.

150.    As a direct and proximate consequence of the unlawful and unconstitutional ATE notice of violation, Plaintiff Bekker suffered actual damages, in that he was forced to expend substantial time and endure substantial inconvenience unsuccessfully fighting this citation, and was forced to pay an unlawful and excessive fine of $200, plus a $10 appellate filing fee.

## CLASS ACTION ALLEGATIONS

151.    Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action against Defendant as a class action on behalf of themselves and all members of the following defined classes of similarly situated persons (the "Classes" or "Class Members"):

**Camera 73 Class  (Plaintiffs Matthews, Matthews, and Bekker)**: All persons who were issued a speeding violation by the Automated Ticketing Enforcement ("ATE") System located on D.C. 295, 0.4 miles south of Pennsylvania Avenue SE headed southwest bound where the civil fine was doubled for a work zone.

**Declaratory and Injunctive Relief Class (All Plaintiffs)**: All persons who were issued a speeding violation by any of the cameras in the Automated Ticketing Enforcement ("ATE") System located on D.C. 295 in the areas affected by the five (5) construction projects collectively known as Improving D.C. 295, where the civil fine was doubled for a work zone from May 24, 2019 to the present.

152.    Plaintiffs reserve the right to amend the above definition(s), and/or to propose other or additional classes, in subsequent pleadings and/or motions for class certification.

153.    Plaintiffs reserve the right to amend the above definition(s), and/or to propose other or additional classes, in subsequent pleadings and/or motions for class certification.

154.    Excluded from the Classes are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise control or controlled; and any legal representative, predecessor, successor, or assignee of Defendant.

155.    This action satisfies the requirements for a class action under Fed. R. Civ. P. 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4).

156.    Though the exact number and identities of the Class Members are currently unknown, Plaintiffs believe that the proposed Classes as described above consist of thousands of members and can be identified through Defendant's records. The Classes are therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable.

157.    Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class Members. Common questions include, but are not limited to, the following:

     a.    Whether the roadway at issue in this matter was a non-existent or improper work zone;

     b.    Whether Plaintiffs and Class Members are entitled to a declaration that the Defendant's practice of issuing ATE violation notices that doubled the civil fines for this non-existent or improper work zone is unconstitutional (as applied) and all such notices are thus void;

     c.    Whether Plaintiffs and Class Members are entitled to a declaration that the City's practice of issuing ATE violation notices that doubled the civil fines for this non-existent or improper work zone is unlawful under District of Columbia law and all such notices are thus void;

d.     Whether Plaintiffs and Class Members are entitled to an injunction preventing Defendant from collecting on and/or otherwise enforcing ATE violation notices that double the civil fines for non-existent or improper work zones;

e.     Whether Defendant's practice of issuing unlawful, unconstitutional and void ATE violation notices that doubled the civil fines for non- existent or improperly established work zones resulted in Defendant unjustly retaining a benefit to the detriment of Plaintiffs and Class Members;

f.     Whether Defendant's retention of this benefit violates the fundamental principles of justice, equity and good conscience; and

g.     Whether Plaintiffs and Class Members are entitled to damages.

158.   The claims asserted by Plaintiffs are typical of the claims of the Members of the Class they seek to represent because, among other things, Plaintiffs and Class Members sustained similar injuries as a result of Defendant's uniform wrongful conduct; Defendant owes the same duty to each Class Member; and Class Members' legal claims arise from the same conduct by Defendant.

159.   The claims asserted by Plaintiffs are typical of the claims of the Members of the Class they seek to represent because, among other things, Plaintiffs and Class Members sustained similar injuries as a result of Defendant's uniform wrongful conduct; Defendant owes the same duty to each Class Member; and Class Members' legal claims arise from the same conduct by Defendant.

160.   Plaintiffs will fairly and adequately protect the interests of the proposed Class. Plaintiffs' interests do not conflict with the Class Members' interests. Plaintiffs have retained class counsel experienced in class action litigation to prosecute this case on behalf of the Class.

161.   Prosecuting separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant.

162.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Class Members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class Members to prosecute their claims individually. Trial of Plaintiffs and Class Members' claims on a class basis, however, is manageable. Unless the Class is certified, Defendant will remain free to continue to engage in the wrongful conduct alleged herein without consequence.

163.    Certification of the Classes, therefore, is appropriate under Rule 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual Class Members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

164.    Certification of the Classes is also appropriate under Rule 23(b)(2) because Defendant has acted, or have refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or equitable relief with respect to the Classes as a whole.

165.    Certification of the Classes is also appropriate under Rule 23(b)(1) because the prosecution of separate actions by individual Class Members would create a risk of establishing incompatible standards of conduct for Defendant.

166.    Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claim consists of particular issues that are common to all Class and Subclass Members and are capable of class-wide resolution that will significantly advance the litigation.

167.    Defendant's wrongful actions, inactions, and omissions are generally applicable to the Classes as a whole and, therefore, Plaintiffs also seek equitable remedies for the Class.

168.    Defendant's systemic policies and practices also make injunctive relief for the Class

appropriate.

169.   Absent a class action, Defendant will retain the benefits of its wrongdoing despite its serious violations of the law and infliction of economic damages, injury, and harm on Plaintiffs and Class Members.

## COUNT I
## Unjust Enrichment

170.   Plaintiffs incorporate Paragraphs 1 through 169 above as if fully restated herein.

171.   Defendant has demanded and received doubled civil fines from Plaintiffs and other Class Members for alleged ATE violations that occurred in alleged work zones.

172.   For the reasons set forth above, the doubled civil fines are unlawful and unconstitutional, as there were not multiple "signs" posted and there was no work zone.

173.   As a direct result, Defendant has collected civil fines from Plaintiffs and Class Members to which they were not entitled.

174.   Plaintiffs and Class Members conferred a benefit on Defendant, to wit: payment of unlawful civil fines that are double the amount otherwise prescribed.

175.   Defendant had knowledge of the benefit, in that the Defendant itself collected the unlawful civil fines.

176.   Defendant knowingly appreciated, accepted and retained the benefit conferred (*i.e.*, the unlawfully doubled civil fine), which has resulted and continues to result in an inequity to Plaintiffs and Class Members.

177.   Defendant thus unjustly received and retained a benefit belonging to Plaintiffs and Class Members, who have therefore suffered a commensurate detriment constituting money damages.

178.   Defendant's retention of this benefit violates the fundamental principles of justice,

equity and good conscience, and the circumstances are such that it would be inequitable for the Defendant to retain the benefit of the unlawfully doubled civil fine.

179.    WHEREFORE, Plaintiffs pray that the Court:

a.    Certify this case to proceed as a class action;

b.    Award injunctive relief to stop the Defendant's conduct leading to Defendant's unjust enrichment;

c.    Award Plaintiffs and Class Members damages equal to the portion of the fines that is unlawfully doubled, in an amount to be determined herein, including pre- and post-judgment interest;

d.    Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

e.    Order such other and further relief as this Court deems equitable, just and proper.

## COUNT II
### Money Had and Received

180.    Plaintiffs incorporate Paragraphs 1 through 169 above as if fully restated herein.

181.    Defendant received money from Plaintiffs and putative Class Members.

182.    Defendant received money under the label of "civil fines" that were doubled due to an alleged work zone that was both non-existent, and that was not marked in accordance with the D.C. Code.

183.    Defendant had appreciated the benefit, in that the Defendant itself received and retained the unlawfully doubled fine.

184.    The circumstances are such that Defendant should, in all fairness, be required to return the money that represents the unlawfully doubled fine to the Plaintiffs and putative Class

Members, as there was no work zone as defined by D.C. Code § 50-2201.02(20) and the alleged work zone was not marked by multiple "signs" in accordance with D.C. Code § 50-2201.04c.

185.    WHEREFORE, Plaintiffs pray that the Court:

a.    Certify this case to proceed as a class action;

b.    Award injunctive relief to stop the Defendant's conduct leading to Defendant's unlawfully receiving the doubled fines;

c.    Award Plaintiffs and Class Members damages equal to the portion of the fines that is unlawfully doubled, in an amount to be determined herein, including pre- and post-judgment interest;

d.    Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

e.    Order such other and further relief as this Court deems equitable, just and proper.

**COUNT III**
**Violation of Protection Against Excessive Fines – U.S. Const. Amend. VIII.**
**42 U.S.C. § 1983**

186.    Plaintiffs incorporate Paragraphs 1 through 169 above as if fully restated herein.

187.    Pursuant to statute, the Defendant is operating under the authority of the D.C. Code when it assessed or collected doubled civil fines for ATE violations occurring in this alleged work zone. Defendant retains such monies collected.

188.    The enforcement of the doubled civil penalty assessments discussed above constitutes a violation of the United States Constitution's Eighth Amendment's protection against excessive fines. Plaintiffs and Class Members were assessed unlawfully doubled fines and penalties that bear no relationship to the harm caused and are therefore unconstitutional.

189.    The imposition, collection, and retention of double civil fines for ATE violations occurring in the alleged work zones is done to raise revenue for Defendant, and not for the purpose of promoting public safety.

190.    As shown in detail above, Defendant's improper purpose (*i.e.*, to raise revenue under the pretext of public safety by unlawfully doubling fines for non-existent or improperly marked work zones) is part of Defendant's larger systemic custom and practice to configure its ATE system to maximize revenue.

191.    This improper purpose is carried out under the direction of DDOT Director Marootian and by the team of twenty (20) D.C. employees overseeing the ATE program, in the course and scope of their official job duties as D.C. employees.

192.    As a direct and legal result of the acts and omissions of Defendant, acting under the authority of the D.C. Code, Plaintiffs and Class Members have suffered damages, and/or are entitled declaratory, injunctive relief and to restitution of the unlawfully assessed doubled fines, in an amount to be proven at trial.

193.    WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiffs request that the Court enter judgment in their favor and in favor of the class, against Defendant, for:

a.    An order certifying this case to proceed as a class action;

b.    Injunctive relief to stop the Defendant's unlawful policies, procedures, practices and/or customs described above;

c.    Restitution of the doubled civil fines unlawfully collected and retained to the Plaintiffs and Class Members;

d.    Recovery of actual damages; and

e.    Pursuant to 42 U.S.C. § 1988, Plaintiffs further seek costs and attorneys' fees

incurred as a result of this lawsuit.

**COUNT IV**
**Violation of Due Process – U.S. Const. Amend. XIV § 1.**
**42 U.S.C. § 1983**

194.    Plaintiffs incorporate Paragraphs 1 through 169 above as if fully restated herein.

195.    Plaintiffs and putative Class Members have a valid, protectable property interest in the payment of unlawfully doubled fines for traffic violations.

196.    By paying or being assessed unlawful doubled civil fines imposed by Defendant for ATE violations occurring in the alleged or improperly marked work zones, Plaintiffs and Class Members were deprived of their valid, protectable property interest.

197.    Defendant is acting under color of state law and with authority delegated by the state, and have acted unreasonably, arbitrarily and irrationally in seeking, collecting and retaining doubled civil fines for ATE violations occurring in these alleged or improperly marked work zones.

198.    Defendant acted with improper purpose, in that the imposition, collecting, and retaining of doubled civil fines for ATE violations occurring in this alleged work zone was done to raise revenue, and not for any public safety purpose.

199.    Defendant's improper purpose (*i.e.*, to raise revenue under the pretext of public safety by unlawfully doubling fines for non-existent or improperly marked work zones) is arbitrary, egregious, and shocks the conscience.

200.    Defendant's improper purpose deprives Class Members of due process by subjecting them to proceedings in which Defendant has a financial interest.

201.    As shown in detail above, Defendant's improper purpose (*i.e.*, to raise revenue under the pretext of public safety by unlawfully doubling fines for non-existent or improperly marked work zones) is part of Defendant's larger systemic custom and practice to configure its

ATE system to maximize revenue.

202.    This improper purpose is carried out under the direction of DDOT Director Marootian and by the team of twenty (20) D.C. employees overseeing the ATE program, in the course and scope of their official job duties as D.C. employees.

203.    Defendant's deprivation of Plaintiffs and Class Members' valid, protectable property interest for the improper purpose of raising revenue violates the United States Constitution's 14th Amendment due process rights of Plaintiffs and Class Members.

204.    WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiffs request that the Court enter judgment in their favor and in favor of the class, against Defendant for:

     a.     An order certifying this case to proceed as a class action;

     b.     Injunctive relief to stop the Defendant's unlawful policies, procedures, practices and/or customs described above;

     c.     Restitution of the double civil fines unlawfully collected and retained to the putative Class;

     d.     Recovery of actual damages; and

     e.     Pursuant to 42 U.S.C. § 1988, Plaintiffs further seek costs and attorneys' fees incurred as a result of this lawsuit.

## COUNT V
### Declaratory and Injunctive Relief

205.    Plaintiffs incorporate Paragraphs 1 through 169 above as if fully restated herein.

206.    The Declaratory Judgment Act empowers the courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

207.    As set forth above, the District's power to operate and enforce ATE systems is

limited and must be in accordance with certain restrictions set forth in the D.C. Code. Despite this limitation, the District issued Plaintiffs and other Class Members ATE violation notices that do not comply with the requirements of D.C. Code §§ 50-2201.04c & 50-2201.02(20), in that the civil fines were unlawfully doubled due to improperly marked work zones. All such violations are thus invalid and unenforceable.

208.    Defendant's practice of unlawfully doubling civil fines in improperly marked work zones on Interstate 295 southbound is continuing and ongoing. As alleged above, on March 29, 2020, Plaintiffs Makya Little, Delmar Little, and James Gartner all were assessed improperly doubled fines from the D.C. speed camera located at "D.C. 295 SE 0.4 miles s/o E2 s/b," or approximately half a mile south of Exit 2 (at Malcolm X Avenue SE) on Interstate 295 southbound.

209.    All Plaintiffs are still at substantial risk of being assessed unlawfully doubled fines because Defendant D.C.'s conduct on Interstate D.C. 295 is continuing and ongoing, and because the custom and practice of configuring DC's ATE system to maximize revenue is persistent and ongoing.

210.    Plaintiffs seek a judgment declaring that the Defendant's ongoing and continuing practice of issuing ATE violation notices that doubled the civil fines for improperly marked work zones is unlawful under the D.C. Code and, therefore, that all such violations are void and unenforceable.

211.    Plaintiffs have a personal claim for the doubled civil fines that they were assessed which is capable of being affected and are entitled to the requested declaratory relief. As detailed above, this case presents an actual controversy that requires an immediate and definitive determination of the parties' rights.

212.    Plaintiffs possess a clearly ascertainable right to be free from the unlawful and

unconstitutional actions set forth above and are currently in need of protection. As detailed above, Plaintiffs have raised a fair question concerning the existence of this right.

213.    There is a bona fide dispute as to the lawfulness and constitutionality of Defendant's imposing of doubled civil fines for all non-existent or improperly marked work zones on Interstate D.C. 295, and the legal and equitable relationships between the parties, which have adverse interests to each other, are directly implicated.

214.    For the reasons set forth above, Plaintiffs have a likelihood of success on the merits by demonstrating that Defendant's practice of issuing ATE violation notices with doubled civil fines for all non-existent or improperly marked work zones on Interstate D.C. 295 is unlawful and unconstitutional.

215.    Plaintiffs and Class Members will suffer irreparable harm if an injunction is not granted. Defendant's unlawful and unconstitutional practice, including the collection of doubled civil fines and penalties related thereto and the additional threats outlined above, is causing substantial, immediate, and continuing damage to Plaintiffs and Class Members. As a result, Plaintiffs and Class Members may suffer irreversible damage to their credit from threatened collection actions by the Defendant and the possible reporting of non-payment to credit agencies, be subject to vehicle immobilization or seizure and/or holds on vehicle registration renewal and suffer other harm and inconveniences as a result of the Defendant's unlawful and unconstitutional practice. There is no adequate remedy at law available to Plaintiffs and Class Members that would protect against the above harms.

216.    WHEREFORE, Plaintiffs pray that the Court:

a.      Declare that the Defendant's practice of issuing ATE violation notices that doubled the civil fines for all non-existent or improperly marked work zones

is unlawful or unconstitutional and, therefore, that all such violation notices are void and unenforceable;

b.  Grant preliminary and permanent injunctive relief prohibiting the Defendant from collecting on and/or otherwise enforcing ATE violation notices that double the civil fines for all non-existent or improperly marked work zones on Interstate D.C. 295;

c.  Award Plaintiffs and Class Members damages in an amount to be determined herein, including pre- and post-judgment interest;

d.  Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

e.  Order such other and further relief as this Court deems equitable, just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues that may be tried and decided by jury.

Dated:  May 4, 2020                             Respectfully submitted,


 /s/ David K. Lietz
**MASON LIETZ & KLINGER LLP**
David K. Lietz (D.C. Bar No. 430557)
Danielle L. Perry (D.C. Bar No. 1034960)
Gary E. Mason (D.C. Bar No. 418073)
5101 Wisconsin Avenue NW, Suite 305
Washington, D.C. 20016
Tel.: (202) 429-2290
Fax: (202) 429-2294
dlietz@masonllp.com
dperry@masonllp.com
gmason@masonllp.com

*Attorneys for Plaintiffs and Class Members*